that ground. I read Commissioner Schwartz's scholarly discussion of the parole evidence rule, adopted by the court in Sylvania Elec. Products, Inc. v. United States, 458 F.2d 994, 198 Ct.Cl. —— (decided April 14, 1972), as allowing such evidence to explain an ambiguous statement or add additional terms, not to contradict the writing. The writing is unambiguous, in light of ITT, *supra,* that the contract may be non-extended for any reason at all, including even inadvertence and clerical error, even if funds are available. However, I read Mr. Scala as answering the question put to him, that for the first year funds were available, so bidders could feel easy about that likely hazard to the contract's continued life.

I think it overstretches Mr. Scala's remark to make it, as the court does, a commitment as to what defendant would do in the event that occurred, a protest against the award by an unsuccessful bidder, a questioning by the Comptroller General of the propriety of the award, and his recommendation that it should not be extended. I deem it a fair and proper use of the pre-bid conference that any prospective bidder who wanted to be reassured about this should have asked about it.

In John Reiner & Co. v. United States, 325 F.2d 438, 163 Ct.Cl. 381 (1963), cert. denied, 377 U.S. 931, 84 S. Ct. 1332, 12 L.Ed.2d 295 (1964) we recognized the propriety of the Comptroller General's review of awards, and his making recommendations and rendering decisions that awards or contracts should be cancelled or withdrawn, even though they would not be held invalid in court. In such circumstances, the contract is not a nullity and the contractor is not left without a remedy, but it is logical to expect the use of the contract's own provisions to get the Government out of its deal as cheaply as the clauses will allow. In Reiner, the termination article was so used, but in the case of a multiple fiscal year procurement with option to extend it would be foreseeable that the Comptroller General might rec-

ommend that the contract simply not be extended. It appears to me that the plaintiff accepted the award with this hazard inherent. It certainly appears equitable to use a termination settlement as a sweetener but it seems to me contrary to the contract. The procurement community must accept the fact that there is a bid protest procedure, and it would seem equally so that sometimes it may cause someone a loss. Unless the contract provides relief, it would seem the loss must lie where it fell. I note that in the ITT case, *supra,* the contract we construed there included, besides a termination article, a more limited provision for reimbursement of some costs in cases of non-extension. If parties don't contract for this, I don't think they get it.

I add, if everything I say above is wrong, there remains a doubt whether the exculpatory clauses discussed in the court's opinion do not exculpate defendant here.

KUNZIG, Judge, joins in the foregoing dissenting opinion.

**Trust U/W Lida R. TOMPKINS et al.**
**v.**
**The UNITED STATES.**
**No. 315–66.**

United States Court of Claims.
June 16, 1972.

Stanley Worth, Washington, D. C., attorney of record, for plaintiffs; Hamel, Park, McCabe & Saunders, Washington, D. C., of counsel.

Ira Mark Bloom, Washington, D. C., with whom was Acting Asst. Atty. Gen. Fred B. Ugast, for defendant; Philip R. Miller and Theodore D. Peyser, Jr., Washington, D. C., of counsel.

Before COWEN, Chief Judge, DURFEE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, and KUNZIG, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on September 27, 1971. Exceptions to the commissioner's opinion, findings of fact and recommended conclusion of law were filed by plaintiff, defendant requested the court to adopt the findings of fact and conclusion of law and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion, findings of fact and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case.* Therefore, plaintiff is not entitled to recover and the petition is dismissed.

## OPINION OF COMMISSIONER

GAMER, Commissioner:

Lida R. Tompkins, a resident of Washington, D. C., died in 1953. As vice-president and treasurer, and a 36 percent stockholder, she had been active with her husband, Charles H. Tompkins, in the construction business carried on by the Chas. H. Tompkins Company, a firm organized and controlled by her husband. In addition, she owned substantial real and personal property, including life insurance policies, various stocks and bonds, and interests in commercial properties producing rental income. The commercial properties were held jointly with her husband.

By her will, Mrs. Tompkins (sometimes herein referred to as "the decedent") created a trust to which all of her real estate interests passed upon her death. She designated her husband as the executor of her estate and as the sole trustee of the testamentary trust.

In 1954, her husband, as executor, filed the federal estate tax return. The return showed a net estate of over $1,230,000, and a tax thereon of over $379,000, which amount was then paid.

---

* The opinion of Nichols, Judge, concurring in part and dissenting in part, in which Skelton, Judge, joins follows the opinion of the trial commissioner which has been adopted by the court.

Mr. Tompkins, as executor, filed his final estate account in January 1956. Upon approval thereof by the probate court in July of that year, all remaining assets of the estate, consisting of principal and income account balances aggregating over $1,000,000 were distributed to the trust (Charles H. Tompkins, as executor, distributing the assets to Charles H. Tompkins, as trustee).

However, the following year the Commissioner of Internal Revenue, by a notice dated May 24, 1957, asserted a deficiency in the federal estate tax in the amount of over $2,160,000. The Commissioner felt that certain of the stocks, life insurance policies, and real estate listed in the estate tax return had been undervalued.

As stated, by this time the estate had been closed. Furthermore, Charles H. Tompkins had died the previous December. Under the provisions of decedent's will, two individuals and the Riggs National Bank of Washington, D. C., had become successor trustees of the testamentary trust. The will also named the same three as successor executors in the event the appointment of such successors became necessary.

The successor executors concluded that the deficiency asserted by the Commissioner should be contested. However, the trust did not have the cash with which to pay such large assessed amount, plus interest, as a basis for a refund suit in the United States Court of Claims or a United States District Court, nor did the executors consider that it would be prudent to raise the necessary amount by borrowings (assuming it would be possible to do so) or by sales of the real properties in the trust at what they felt would amount to forced liquidation prices. Accordingly, they decided that the best course to follow would be to contest the deficiency in the Tax Court of the United States, thereby making it unnecessary to make such a large payment at that time. Accordingly, upon their petition, the probate court took the necessary action to reopen the estate, to designate the three parties as successor executors, and to authorize them to contest the asserted federal estate tax liability, following which, as such executors, they filed, on August 21, 1957, a petition in the Tax Court for redetermination of the asserted deficiency.

Since all of the trust property came from the estate, the trustees recognized the trust's responsibility, as transferee, for any increased estate tax liability. Consequently, as both trustees and executors, they considered it unnecessary, upon the reopening of the estate, to go through the mechanics of transferring the trust property back to the estate.

Prior to the trial in the Tax Court, the parties were able to arrive at an agreement settling all of the disputed issues, with one exception. That exception involved the value of 186 shares of common stock of a close corporation called the H Street Building Corporation, all of the outstanding 650 shares of such stock being owned by members of the Tompkins family. The agreement of the parties was set forth in a stipulation filed in the Tax Court in September 1959.

The partial settlement was in itself sufficient to increase the estate's net assets by over $878,000, on which basis alone there was an agreed deficiency in estate tax of over $390,000.

Thereupon, the trustees, to halt the further accumulation of interest on such part of the agreed deficiency, decided to pay it, plus the interest thereon. Certain profitable sales of real estate in which the trust had an interest had been effected by the successor trustee-executors, and the trust was then in a sufficiently liquid position to be able to make such payment. Accordingly, in June 1960, August 1960, and May 1961, the trustees so paid $270,000, $95,000, and $185,250, respectively, totaling $550,250, designating $197,100, $68,500, and $130,000, respectively, or a total of $395,600, as applicable to the deficiency, and $72,900, $26,500, and $55,250, re-

spectively, or a total of 154,650, as applicable to interest.

After they became successor trustees following the death of Mr. Tompkins in 1956, the trustees annually filed fiduciary income tax returns of the trust. For the calendar year 1959, they paid a tax of $485.63. The return for the calendar year 1960 was filed on April 14, 1961, and for such year the trustees paid a tax of $19,923.22. Although, as shown, they had made during such year two payments on account of the deficiency in the estate tax, of which $99,400 was allocated to interest, the return indicated no interest deductions at all for such year (nor did the return for the calendar year 1961 show any such deduction for interest, although, as indicated, $55,250 of the $185,250 payment with respect to the deficiency made during that year was allocated to interest).

Thereafter, the Tax Court, by an opinion filed on December 22, 1961, determined the sole issue upon which the parties had been unable to agree.[1] It decided that the value of the 186 shares of common stock of the H Street Building Corporation was $1,023,000, or $5,500 per share (instead of $155,193, or $834.32 per share, as set forth in the estate tax return). This finding, which was accepted by the parties, served to increase the estate tax deficiency by an amount of over $410,500. This indebtedness, plus interest, as adjusted by a credit for local taxes, was liquidated by two payments made in 1962 totaling over $418,000, of which $139,347.23 was allocated to interest. These payments too were made by the trustees of the testamentary trust out of trust funds. By 1962, as a result of further profitable sales of real estate which the decedent had jointly owned with her husband, there was only one income producing property left in which the trust had such an interest.

In March 1963, the trustees filed their federal fiduciary income tax return for the calendar year 1962. This time they did take an interest deduction with respect to the interest they had paid on the estate tax deficiency. However, although, as stated, they had paid almost $140,000 in such interest during the year, they took a deduction of only $35,168.12 (such computation not being explained in the return). In any event, the return indicated no taxable income and no tax liability.

The following year, the plaintiff trust received a letter dated August 25, 1964, from the District Director of the Internal Revenue Service at Baltimore, Maryland, which must have been a pleasant surprise. It informed plaintiff that, upon an examination of the fiduciary income tax returns it had filed for the five years 1957, 1959, 1960, 1961, and 1962, it was concluded that the entire aforementioned amounts of $485.63 and $19,923.22 which it had paid for 1959 and 1960, respectively, constituted overpayments. The report of the revenue agent who had made the examination was enclosed with the letter and explained the various changes made which produced this result. The report showed that such 1959 and 1960 overpayments stemmed from drastic changes, to the trust's benefit, which the agent made with respect to 1962. For such year, instead of an interest deduction of only $35,168.12 with respect to the estate tax deficiency which the trust had taken, the agent allowed the full amount of $358,921.47 in interest which plaintiff had paid in 1960, 1961, and 1962. The agent felt that the interest payments made in 1960 and 1961 did not constitute proper deductions for those years (as shown, plaintiff had not in fact claimed them as deductions in those years) because "no indebtedness is recognized for contested tax deficiencies" (i.e., the estate's petition for redetermination of the asserted deficiency was still pending during those years). Accordingly, he concluded that "the interest payments made during 1960 and 1961 must be grouped with the 1962

1. Estate of Lida R. Tompkins, 20 TCM 1763.

payment and only deductible during 1962" (the Tax Court's final decision pursuant to its previous opinion having been entered on May 10, 1962, and the deficiency resulting therefrom having been completely liquidated in that year). Although, as against no taxable income for 1962, as the trust had reported in its return, the agent concluded that the trust had in fact realized over $78,000 of such income, the large interest deduction which he allowed nevertheless served again to produce no tax liability. Furthermore, such large interest deduction resulted in an excess of deductions over income in the amount of over $245,000 which the agent allowed as a net operating loss carryback (plaintiff had claimed no such operating loss carryback). It was this carryback first to 1959 and then to 1960 which served to eliminate the above-mentioned tax liabilities for such years (the large increases in taxable income for such years which the agent calculated over the amounts the trust reported in its returns still being insufficient to overcome the loss carrybacks to such years).

As a result, the amounts of $485.63 and $19,923.22 which the trust had paid for its 1959 and 1960 income taxes were refunded, plus interest.

Some five months later, however, the trust received another letter, dated March 9, 1965, from the District Director which contained less felicitous tidings. It informed plaintiff that its previous letter of August 25, 1964, and the revenue agent's report enclosed therewith, on the basis of which plaintiff had received the refunds, contained an important error. This letter too was accompanied by a report of the same revenue agent. This time the agent concluded that the $358,921.47 in interest paid by plaintiff in 1960, 1961, and 1962 attributable to the federal estate tax deficiency, and which was all deductible in 1962, could not nevertheless properly be considered as contributing to a net operating loss. This was so, he reasoned, because, under Section 172(d) (4) of the Internal Revenue Code of 1954, the only deductions allowable to an individual taxpayer (*i.e.*, not a corporation) which could enter into the computation of a net operating loss were those "attributable to a taxpayer's trade or business." The estate tax deficiency was, he concluded, in no way related to any business operation in which the trust was engaged, and the interest expense attributable to such deficiency was similarly to be deemed to constitute a nonbusiness expenditure. Accordingly, the excess of deductions over income for 1962 (previously allowed as an operating loss carryback) did not, he decided, serve to create an allowable net operating loss which could be carried back.[2]

Consequently, the District Director concluded that the amounts of $485.63 (plus interest) for 1959, and $19,923.22 (plus interest) for 1960, which had been refunded to plaintiff, were due and owing after all, and assessed deficiencies against plaintiff in said amounts, plus interest. On April 28, 1965, plaintiff paid such deficiencies, plus interest, but on February 10, 1966, filed refund claims therefor. The basis for the

---

2. The agent divided the trust's 1962 "income" and "deductions" into "business" and "nonbusiness" categories. The commercial rental real properties which had been owned jointly by Mr. and Mrs. Tompkins and with respect to which federal partnership returns of income had been filed (by Mr. and Mrs. Tompkins during their lifetimes, by Mr. Tompkins individually and as trustee after Mrs. Tompkins' death, and by the trustees under the wills of Mr. and Mrs. Tompkins after they both died) were regarded as producing the "business" income and de-

ductions. The entire amount of the interest attributable to the estate tax deficiency, $358,921, was allocated to the "nonbusiness" expenses. There was then computed an excess of nonbusiness deductions over nonbusiness income in the amount of $305,962. On the "business" portion, there was a profit of $48,092, which, offset against the $305,962 "nonbusiness" deficit, resulted in an overall net loss of $257,870, none of which was allowed as a net operating loss deduction which could be carried back.

claims was that "[a]ll of" the trust's "activities * * * were devoted to the handling of the investments constituting the corpus of the trust * * *" and that "[s]uch activities were the taxpayer's trade or business, as were its activities in contesting the asserted deficiency in estate tax * * *." Plaintiff pointed out that "[p]ending the said decision of the Tax Court the taxpayer had full control and use of the investment properties, and the income produced by those properties, in the furtherance of its business activities." It therefore contended that "[t]he interest ultimately paid * * * in 1962, in connection with the deficiency in Federal estate tax, was 'attributable' to its trade or business, and accordingly does not constitute a nonbusiness deduction within the meaning of § 172(d) (4) of the 1954 Code." The claims were disallowed on May 27, 1966, and this suit followed. Plaintiff here contends that the Internal Revenue Service was correct in its first ruling that the 1962 deficit constituted a proper net operating loss carryback which served to eliminate any income taxes owed by the trust for 1959 and 1960, while defendant contends that the Service's contrary second ruling was the correct one.[3]

It must be concluded that the second determination was the proper one since it is clear that the interest paid with respect to the deficiency in the decedent's federal estate tax was not attributable to any trade or business in which the trust was engaged.

Net operating loss carrybacks are permitted by Section 172 of the Internal Revenue Code of 1954. Such a loss is defined in subsection (c) as "the excess of the deductions allowed by this chapter over the gross income," the "excess" to "be computed with the modifications specified in subsection (d)." One "mod-

ification," set forth in paragraph (4) of such subsection, provides:

> (4) *Nonbusiness deductions of taxpayers other than corporations.*
>
> In the case of a taxpayer other than a corporation, the deductions allowable by this chapter which are not attributable to a taxpayer's trade or business shall be allowed only to the extent of the amount of the gross income not derived from such trade or business. * * *

There is no dispute with respect to the general rule allowing interest on indebtedness as a deduction. 26 U.S.C. § 163(a) (1958). Thus, the basic question to be determined is whether the payment by the trust of the estate tax deficiency and the interest thereon was "attributable to" any trade or business in which the trust was engaged. (The same answer would be applicable had the deficiency been paid by the estate itself rather than by the trust, since all of the trust's assets came from the estate.)

Defendant argues that the tax payment was not "attributable to" any trade or business of the plaintiff for the simple reason that plaintiff was in no way engaged in any trade or business.[4] It asserts that the trust's activities "were restricted to the management of investments," and points to what it regards as the admission to such effect made by plaintiff itself in its claims for refund, wherein it stated that "[a]ll of the activities of this testamentary trust were devoted to the handling of the investments constituting the corpus of the trust, collecting the income therefrom, and otherwise observing the provisions of the decedent's testamentary trust." Managing one's own investments does not, defendant says, amount to engaging in a trade or business. On the other hand, plaintiff asserts that its various

---

3. On June 17, 1968, the court denied, without prejudice, plaintiff's motion and defendant's cross-motion for summary judgment and remanded the case to the trial commissioner for trial.

4. In this respect defendant goes beyond the position of the Commissioner of Internal Revenue, who, as above-noted (n. 2) categorized the trust's "partnership" activities as a "business."

activities concerning its real estate holdings constituted a trade or business.

It is, however, not necessary to determine whether all or part of the trust's real estate activities, such as "the handling of the investments" therein or "collecting the income therefrom" amounted to a trade or business because, even if they did, it would make no difference. This is so because it is not evident how an estate tax indebtedness is in any way related or attributable to the operation of any such trade or business. An individual (*i. e.*, "a taxpayer other than a corporation") engaged in a business may, of course, include interest on a business loan in his business expenses, and such an expense would qualify for inclusion in his net operating loss computation. Such interest grows out of or has its origin in an act related or attributable to the business operation. He could not, however, include in such computation interest incurred on a personal or nonbusiness loan. The trust, being an entity "other than a corporation," is similarly circumscribed. An estate tax does not grow out of or have any origin in a business operation. It is not therefore "attributable to" any such business. Instead, the tax is based upon a death and the resulting transfer of property from the decedent to those designated to receive it. Hartley v. Commissioner of Internal Revenue, 72 F.2d 352 (8th Cir. 1934) (aff'd as to other issues, 295 U.S. 216, 55 S.Ct. 756, 79 L. Ed. 1399 (1935)). In *Hartley*, the payment by an estate of the federal estate tax resulted in a net loss to the estate for the year, and the executor sought to carry forward the loss to subsequent years. The court held, however, that the federal estate tax was a nonbusiness expense which should not be included in computing the net operating loss under the comparable provisions of Section 206(a) of the Revenue Act of 1924, ch. 234, 43 Stat. 260.[5] It stated:

The executor properly concedes that the statute providing for carrying forward losses applies only to losses resulting from operation of a business by the taxpayer. * * * His contention is that the estate was carrying on a business and that the estate tax is an expense and loss of such business because it is a lien upon all the property of the estate and it is only by paying such tax that the estate and its business can be preserved. It may be conceded that this estate was carrying on a business within the meaning of the statute and that the preservation of the estate and of its business required payment of the tax but that does not meet the statutory requirement that the loss must arise from and out of the *operation* of the business * * *. An estate tax arises from passage of property from a decedent and is upon the privilege of such transfer. * * * It has no legal connection with the operation of a business and cannot arise from or out of such operation. The contention must be denied. * * * [72 F.2d at 356–357]

Plaintiff attempts to bridge the "business" relationship gap by asserting that the delay gained in liquidating the estate tax deficiency resulting from the Tax Court proceeding, with respect to which delay a substantial part of the interest here in question accrued, enabled it to retain "its investment properties until the time was ripe for realizing a substantial gain," and that such gains, which produced "substantial amounts of taxable income," were "made possible by the fact that plaintiff was not required to pay its indebtedness for estate tax at

5. "Sec. 206. (a) As used in this section the term 'net loss' means the excess of the deductions * * * over the gross income, with the following exceptions and limitations:

"(1) Deductions otherwise allowed by law not attributable to the operation of a trade or business regularly carried on by the taxpayer shall be allowed only to the extent of the amount of the gross income not derived from such trade or business."

or about the due date." The "use of" the "money represented by the indebtedness during all of the intervening time for which it was liable for payment of interest at 6% per annum," says plaintiff, "was in the same category as interest which would have been paid if the amount of deficiency had been borrowed from one or more banking institutions."[6] The contention cannot be accepted. The identical argument could be made by anyone, whether or not he is running a business, who finds he has to liquidate assets, or borrow funds, in order to pay an estate tax. The avoidance of such liquidation or borrowings by delaying payment of the tax until the estate becomes more liquid in due course cannot in itself serve to make the running of the estate's affairs a "business," in the sense that it is the "business" of the estate (or here, the trust), to delay payment of the tax to a more propitious time. This argument merely echoes the clearly untenable contention in plaintiff's refund claims that the trust's "activities in contesting the asserted deficiency in estate tax" constituted "the taxpayer's trade or business" since "[p]ending the said decision of the Tax Court the taxpayer had full control and use of the investment properties, and the income produced by those properties * * *."

Furthermore, even if, contrary to the holding in *Hartley,* the delay in the payment of the estate tax could be deemed to have a business relationship insofar as it helped to preserve a going business in which the trust was engaged, plaintiff does not show which part of its activities falls into such a "business" category, and what corresponding part of the interest or the estate tax deficiency could, therefore, be deemed to be "attributable to" its business activities. Plaintiff, arguing that "the activities of the testamentary trustees * * * were directly related to the conduct of business," [7] apparently regards all of the

trust's activities as constituting a "business." As plaintiff argued in its claims for refund, "all of the activities" of the trust "were devoted to the handling of the investments constituting the corpus of the trust, collecting the income therefrom" and that "such activities were the taxpayer's trade or business * * *." This contention is clearly unsupportable. A large part of the estate-trust consisted of stocks and bonds. Collecting the income therefrom does not amount to engaging in a "business." Similarly, plaintiff's interest in the H Street Building Corporation was as a stockholder. A stockholder's activities with respect to the affairs of a corporation do not amount to the operation of a trade or business. Whipple v. Commissioner of Internal Revenue, 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963).

Plaintiff further attacks the second ruling of the Internal Revenue Service on the ground that it was based on the holdings contained in a Revenue Ruling, No. 58–142, 1958–1 Cum.Bull. 147, and a case, Morse v. United States, 183 F. Supp. 847 (D.Minn.1959), which the Service has now repudiated. The ruling and the case were specifically cited by the revenue agent in his second report in support of his conclusion that "interest expenses attributable to Federal Tax deficiencies' payments are deemed to be nonbusiness expenditures."

In Revenue Ruling 58–142, it was held that state income taxes, interest on state and federal tax deficiencies, and litigating expenses incurred in connection with such taxes, are not "attributable to a taxpayer's trade or business" within the meaning of Section 172(d) (4) for the purpose of allowance as deductions in determining a net operating loss of a taxpayer other than a corporation (except to the extent of the amount of gross income not derived from the trade or business), and that this was so even though such expenditures were related

---

6. Plaintiff's Reply to Defendant's Brief to the Commissioner, pp. 16–17.

7. Plaintiff's Brief to the Commissioner, p. 11.

to and grew out of the income which was derived from the trade or business carried on by the taxpayer. *Morse* similarly held that the taxpayer, who operated an apartment building, was not entitled to treat interest on prior years' income tax deficiencies as a business expense for the purpose of calculating a net operating loss (which could be carried over) despite the fact that the taxpayer had no other source of income except from his business. The deficiencies (and the interest thereon) were considered as indebtednesses personal to the taxpayer and not as expenses or liabilities of the business. The Tax Court had also so held in similar situations. Maxcy v. Commissioner, 26 T.C. 526 (1956); Aaron v. Commissioner, 22 T.C. 1370 (1954). However, the Tax Court, on reconsideration, and other courts, commenced holding otherwise. Polk v. Commissioner, 31 T.C. 412 (1958), aff'd 276 F.2d 601 (10th Cir. 1960) (penalty interest on an assessment of additional income taxes constituted a business expense which was deductible for the purpose of computing a net operating loss); Jacob Rubin v. United States, 60–2 USTC ¶ 9499 (E.D.Va.1960) (interest on income tax deficiencies, and legal and accounting expenses incurred in settling the deficiencies dispute, were attributable to taxpayer's business and therefore deductible for determining a net operating loss carryback, where the alleged unreported income was attributable only to the taxpayer's business income); Reise v. Commissioner, 35 T.C. 571 (1961), aff'd 299 F.2d 380 (7th Cir. 1962) (state income taxes, as well as interest on deficiencies on such taxes and on federal income taxes, were deductions attributable to taxpayer's business, includable in computing net operating loss carryback, Aaron v. Commissioner being specifically overruled); Wood v. Commissioner, 37 T.C. 70 (1961) (legal and accounting fees paid in contesting and settling income tax liability are expenses attributable to a business and includable in computing net operating loss where asserted deficiencies related to adjust-

ments on taxpayer's business income); W. J. Winston v. United States, 62–1 USTC ¶ 9206 (S.D.Tex.1962) (interest on deficiency in income tax due to increase in business income resulting from inventory adjustments was attributable to taxpayer's business and was properly a part of the net operating loss deduction).

Ultimately, the Internal Revenue Service, by Revenue Ruling 70–40, 1970–1 Cum.Bull. 50, reconsidered Ruling 58–142 and, specifically noting the above-mentioned five cases, superseded it insofar as it held that state individual income taxes on net income from business profits, interest on deficiencies in state and federal income taxes arising from adjustments on business income, and litigating expenses incurred in connection with such deficiencies, were not allowable as deductions in determining a net operating loss. Such expenditures are now deemed to be " 'attributable to a taxpayer's trade or business' for purposes of section 172(d) (4) of the Code and, provided they are otherwise deductible, are allowable deductions in determining the net operating loss deduction." *Id.* at 51.

Thus, plaintiff is correct in pointing out that the authorities cited by the revenue agent in support of his conclusion are no longer considered as controlling by the Revenue Service. This is, however, of no significant aid to plaintiff's case because both the original and the superseding Revenue Rulings, as well as the case (*Morse*) relied upon by the revenue agent and the five cases referred to in the new Revenue Ruling, all pertain to income taxes, whereas the instant case involves an estate tax, an entirely different kind of tax. The fundamental problem involved is whether an expenditure is "attributable to" a business. The Service and many courts now recognize that interest on assessed income tax deficiencies which are disputed (as well as legal and accounting expenses related to the dispute) is a business expense if it is shown that the income taxes had their origin in gross income derived

from the operation of the taxpayer's business. In such a case, the connection between the business and the interest is self-evident. But no such connection can be perceived with respect to an estate tax which does not have its origin in or arise from the operation of a business in which the taxpayer is engaged. Instead, it arises from a death and is based on the value of the property the decedent owned. Because of the basic difference between the two types of taxes, the revenue agent perhaps erred in citing income tax authorities when faced with an estate tax problem, and in construing Ruling 58–142 and the *Morse* case as being broadly applicable to interest on all "Federal Tax deficiencies' payments." On the other hand, it is possible that he merely meant to cite those authorities as illustrative of the broad principle that expenses are not allowable for net operating loss purposes unless they are "attributable to" a business. In any event, plaintiff can gain no advantage from the fact that the agent may have relied on wrong (and subsequently repudiated) authorities in arriving at the correct result.

Finally, plaintiff argues that, with respect to the year 1960, it is entitled to recover on the alternate ground that, if the amount of the deficiency interest paid during that year ($99,400) were allowed as a deduction for such year, no tax would have been due anyway, so that no reliance need, therefore, be placed on any loss carryback from 1962. Plaintiff says the revenue agent should have allowed the interest paid in 1960 as a deduction for such year, thereby directly eliminating any such 1960 tax liability, instead of accruing, as he did, all the 1960 (and 1961) payments into 1962. The basis for such allowability is that, at the time the payments were made in 1960, there was, by reason of the partial settlement, no longer any doubt that the

amounts of the deficiency and the interest thereon were due and owing, and that the payments were not, therefore, "being made on a contingent deficiency being litigated" and not finally determined until 1962, as the agent stated in his report.[8]

The assertion of this alternative claim with respect to the year 1960 (no deficiency payments, including interest, having been made in 1959) has its puzzling aspects. It will be recalled that plaintiff itself did not, on its return for that year, take a deduction for the interest in question. Yet it now assails the Service for not, in reviewing its return for such year, giving it such a deduction. It is supposed that one answer plaintiff would tender to this observation would be that it had not claimed any net operating carryback loss deduction for 1962 either, and yet the Service, upon review of its 1962 return, gave it such a deduction anyway. Thus, on this alternate claim, plaintiff is in effect contending that, if the carryback basis for its claim is improper, the Service should, in giving it something it never asked for, have selected a proper basis for the refund instead of an improper one.

■ In any event, this alternative basis for recovery, which was formally advanced for the first time by an amendment to plaintiff's petition filed on March 9, 1970, cannot be considered by the court because it was never asserted in any timely claim for refund. As shown, the only ground for refund of the 1960 tax which plaintiff asserted in the 1966 claim it filed with the Service was the alleged propriety of a net operating loss carryback deduction for 1962 based on the interest in question being, under Section 172(d) (4), "attributable to" its claimed business activities. The deduction now alternatively claimed would have to be based on the deductibility of the interest paid in 1960 under

---

**8.** Defendant now concedes that the Internal Revenue Service erred in concluding that the interest paid in 1960 and 1961 could be deducted only in 1962. It says, "The interest paid in 1960 and 1961 could be deducted only for the years of payment for the reason that, when the payments were made, taxpayer's liability for the interest was uncontingent and uncontested." Defendant's Brief to the Commissioner, p. 14.

Section 163 of the Code pertaining to interest deductions. Thus plaintiff not only failed to claim an interest deduction with respect to 1960 on its 1960 income tax return filed in 1961, but it also failed to assert such a claim as a basis for its refund claim filed in 1966. Apparently, it then agreed with the Service that the interest paid in 1960 (and 1961) was deductible only in 1962. A taxpayer "cannot present one ground for refund in its claim and a different ground in its petition * * *." Union Pacific R.R. Co. v. United States, 389 F.2d 437, 442, 182 Ct.Cl. 103, 109 (1968). This rule "is designed both to prevent surprise and to give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination." *Id.*[9]

For the reasons indicated, plaintiff is not entitled to recover.

NICHOLS, Judge (concurring in part, dissenting in part):

I fully agree with the court and our Commissioner Gamer that the interest the trust paid with respect to a deficiency in federal estate tax was not attributable to a trade or business the trust carried on, and as a result, no net operating loss carryback is available with respect to such interest. Respectfully, I differ as to the other stated issue. I think in the circumstances here involved, a claim for refund based according to its terms soley on a net operating loss carryback may be adequate notice of a claim based

on a Section 163 interest deduction, when the item involved is the same in the real world, and the relief sought is the same.

I start with the statute. Sec. 6511 IRC of 1954, tells us when a claim for overpayment of any tax must be filed. Sec. 7422 tells us no suit for refund may be maintained unless preceded by a claim for refund or credit, according to law, and according to the Secretary's regulations. § 301.6402–2 of the regulations thus referenced, tells us that the refund is not allowable except upon one or more of the grounds set forth in a timely claim.

(b) * * * (1) * * * The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. * * *

The regulation says a claim not complying with this standard will not be considered for any purpose as a claim for refund or credit. This applies as much to a lawsuit as to administrative relief.

No one questions that we must interpret and apply this language as if it were statute law. The question is the meaning of "grounds." The test indicates they are more than facts. I have no doubt that a claim for refund may fail to assert "grounds" even though it sets forth all the relevant facts directly or by reference, if the legal conclusions of the claimant, as stated in the claim, divert the Commissioner's attention away from rather than directing it to-

9. Defendant says that since, under 26 U.S.C. § 6511(a) (1958), a refund claim must be filed within three years after the filing of the return (plaintiff's 1960 return was filed on April 14, 1961), and no claim for refund on behalf of plaintiff was filed until 1966, a refund made by the Service pursuant to its August 1964 or its 1966 determinations which would have been based on a correction of errors in plaintiff's 1960 return (rather than its 1962 return) would have been improper under 26 U.S.C. § 6514 (1958) which bars a refund after the expiration of the period of limitation for filing a claim therefor.

Plaintiff responds that, under the circumstances of this case, such a refund could have been made under the mitigation provisions of 26 U.S.C. § 1311, "Correction of error," and § 1312(4), "Double disallowance of a deduction or credit" the latter section and paragraph permitting an adjustment when the Service's "determination disallows a deduction or credit which should have been allowed to, but was not allowed to, the taxpayer for another taxable year * * *." In view of the disposition made of plaintiff's alternate claim, these contentions need not be decided.

wards the true basis of the claim, under law, as afterwards asserted in court. Commercial Solvents Corp. v. United States, 427 F.2d 749, 192 Ct.Cl. 339, cert. denied, 400 U.S. 943, 91 S.Ct. 242, 27 L.Ed.2d 247 (1970). On the other hand, it is not necessarily fatal if the legal theory of the claimant, as stated in the claim for refund, is subsequently perceived to be incorrect and is abandoned. Continental Foundry & Machine Co. v. United States, 159 F.Supp. 608, 141 Ct.Cl. 604 (1958). Judge Laramore in that case explained that the original theory, though incorrect, did not "present a different fact situation which would require the Commissioner to examine other matters not germane to the dispute such as occurred in United States v. Andrews, 302 U.S. 517, 58 S. Ct. 315, 82 L.Ed. 398." 159 F.Supp. at 613, 141 Ct.Cl. at 612. To the same effect he cites Harry Ferguson, Inc. v. United States, 146 F.Supp. 836, 137 Ct. Cl. 137 (1956).

United States v. Andrews, a 1938 case, appears to be the only instance where the Supreme Court has examined the meaning of "grounds" in the instant regulation, for I do not read Angelus Milling Co. v. Commissioner of Internal Revenue, 325 U.S. 293, 65 S.Ct. 1162, 89 L.Ed. 1619 (1945) as coming to grips with that definitional problem. In Andrews, the Court said 302 U.S. at p. 524, 58 S.Ct. at p. 319:

> * * * Where a claim which the Commissioner could have rejected as too general, and as omitting to specify the matters needing investigation, has not misled him but has been the basis of an investigation which disclosed facts necessary to his action in making a refund, an amendment which merely makes more definite the matters already within his knowledge, or which, in the course of his investigation, he would naturally have ascertained, is permissible. On the other hand, a claim which demands relief upon one asserted fact situation, and asks an investigation of the elements appropriate to the requested relief,

cannot be amended to discard that basis and invoke action requiring examination of other matters not germane to the first claim.

The facts in *Andrews* clearly fell in the second class, thus stated, and therefore the Court held for the Commissioner. I read the opinion, however, as sanctioning the distinction I derive from our own cases, cited supra, that is, whether the "grounds" asserted in the claim direct the Commissioner's attention towards or away from the grounds relied on in court.

I would further add that our toleration of the incorrect claim in *Continental Foundry & Machine Co.* was, I think, much aided by the fact that, to prepare a correct claim, taxpayer would have had to foresee a subsequent change in the legal climate. So here. Defendant having itself put forward the idea that plaintiff could get its interest payment as a deduction from its 1960 gross income only by way of carryback from 1962, now abandons its position and says it can be taken directly as a 1960 deduction and in no other way. I submit that when a change in legal climate takes place at 12th and Constitution Avenue, NW., defendant is under an obligation to give a broad and sympathetic reading to any claim for refund prepared in conformity to its known previous view. Any error so originating ought not to mislead or divert the Commissioner from his true duty, which is to ascertain whether the taxpayer has overpaid his taxes. United States v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S.Ct. 278, 77 L. Ed. 619 (1933), (Cardozo, J.). Here the Commissioner perhaps perceived the sterling merit of his new position precisely because it differed from the theory of the refund claim, and therefore could, as he supposed, be espoused as an abstract proposition without generating the obligation to pay a refund in actual dollars.

The refund claim and the two revenue agent's reports show all the facts necessary to sustain a direct 1960 deduction for the interest payment. The only ap-

parent defect in the claim consists of the irrelevant facts and arguments adduced in an effort to satisfy the criteria the Commissioner himself had declared were controlling. When the Commissioner changed his position, he should have examined this and other like pending claims to see whether they set forth any justification for relief under his newly arrived at view. The taxpayers had not diverted the Commissioner, rather the Commissioner had diverted the taxpayers.

While no one doubts the good faith of the Internal Revenue officials, the fact remains that the court here sanctions the use of the Regulation by them, with their shifts of position, in effect to trick the plaintiff out of a valid refund claim. I do not think either the language of the Regulation or the decided cases necessitate a result that shocks the moral sense, and is a "legal extortion that should not be countenanced." (Skelton, J., dissenting in National Newark & Essex Bank v. United States, 410 F.2d 789, 795, 187 Ct.Cl. 609, 620 (1969).

To close this off, for I do not favor long dissents, I need only add that I do not find in that case, nor in Union Pacific RR Co. v. United States, 389 F.2d 437, 182 Ct.Cl. 103 (1968) (the only one cited by Commissioner Gamer), anything in conflict with the view of the instant case here taken. I joined in both of them, and in *Commercial Solvents, supra,* and think they were correctly decided, but this case is different. If, as intimated in *Union Pacific,* there is something special and peculiar about a carryback claim, this was such a claim. While the decisions on "informal claims", *e. g.,* Newton v. United States, 163 F.Supp. 614, 143 Ct.Cl. 293 (1958) and cases cited, involve a different issue, I think they show the existence, or former existence, of a judicial approach to the claim for refund which I cannot reconcile in principle with the decision herein. Either the taxpayer must turn all the square corners and all the handsprings the Commissioner prescribes, or he need not. Either the

Commissioner knows what he knows when he reads a claim for refund or he does not. The Supreme Court's decision in United States v. Kales, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941) thus will be an incongruous shelfmate with the instant case, and hard to view as a product of the same judicial system.

SKELTON, Judge, joins in the foregoing opinion concurring in part and dissenting in part.

Antonio **BENEVENTO** et al.

v.

The **UNITED STATES.**

Anthony F. **VEARA**

v.

The **UNITED STATES.**

Richard E. **ADAMS** et al.

v.

The **UNITED STATES.**

Nos. 170–66, 298–66 and 28–67.

United States Court of Claims.

June 16, 1972.

