**COMMERCIAL SOLVENTS CORPORATION**
v.
**The UNITED STATES.**
No. 361–63.

United States Court of Claims.
June 12, 1970.

Jay O. Kramer, New York City, attorney of record, for plaintiff; Morton M. Cohen, New York City, of counsel.

Gilbert W. Rubloff, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant; Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION *

LARAMORE, Judge.

This is an action to recover an alleged overpayment of Federal income tax paid for the tax year 1948, plus interest as provided by law. The controversy arises from a transaction whereby plaintiff-taxpayer agreed to receive a sum certain payable in installments in cancellation of an executory contract. The issues before us involve (1) whether plaintiff may claim a refund in this suit on grounds relating to the appropriate year or years for reporting taxable gain, which grounds were not included in plaintiff's refund claim but were advanced for the first time in plaintiff's amended petition, and (2) whether such gain is taxable as ordinary income or capital gain.[1] We hold that plaintiff is not entitled to recover; the pertinent facts incident to our holding follow.

Plaintiff, Commercial Solvents Corporation, is engaged in the manufacture, import, export, sale, and purchase of chemicals, solvents, drugs, fertilizers, and related by-products. During 1947, it operated a plant in Sterlington, Louisiana, where it produced anhydrous ammonia from natural gas. The output of the Sterlington plant was sold by plain-

---

\* We are indebted to Trial Commissioner Lloyd Fletcher for his findings of fact and recommended opinion with respect to the capital gain issue, which have been adopted in their near entirety.

[1]. The original petition asserted, as the sole ground for recovery, plaintiff's contention that the amounts received and receivable under the cancellation agreement represented proceeds from the sale of a capital asset rather than ordinary income. Later, however, the petition was amended to reflect plaintiff's additional contentions to the effect that payments should be taxed as and when received by plaintiff rather than accrued in their entirety in 1948. See p. 753, infra.

tiff to fertilizer manufacturers in the Gulf States where it had developed a marketing network.

In January 1947, the Mathieson Chemical Corporation (Mathieson) had leased from the United States for ten years an ammonia plant located at Lake Charles, Louisiana.[2] At that time, Mathieson had little experience in the fertilizer industry, and its management had no specific plans for the use of the Lake Charles plant.

At about the same time, plaintiff's officers learned of successful experiments in applying anhydrous ammonia directly to the soil as a fertilizer. They correctly anticipated that this new development would result in a greatly increased demand for anhydrous ammonia. Since plaintiff's Sterlington plant was operating at full capacity, plaintiff's representatives approached officials of Mathieson for the purpose of discussing the possibility of plaintiff's purchasing and distributing the anhydrous ammonia production from Mathieson's Lake Charles plant.

As a result of these discussions, plaintiff and Mathieson entered into a contract on November 10, 1947, whereby Mathieson agreed to sell to plaintiff the entire anhydrous ammonia production from its Lake Charles plant, except for a reserved quantity not to exceed ten tons per day, for a period of eight years commencing July 1, 1949. Under the contract, plaintiff was to pay Mathieson the market price for all anhydrous ammonia purchased less deduction for (1) $2.50 per ton for freight equalization, (2) $2.50 per ton of ammonia shipped in plaintiff's tank cars, and (3) a commission of five percent of the market price, after deducting the allowances for freight equalization and for use of plaintiff's tank cars. Plaintiff intended to sell the major portion of this anhydrous ammonia as fertilizer for direct application to the soil by farmers in the same way and under the same method of distribution which plaintiff was then using to sell the anhydrous ammonia production of its Sterlington plant.

In April 1948, Thomas Nichols became the new president of Mathieson, and J. C. Leppart assumed the executive vice-presidency of that company. They immediately reviewed all outstanding contracts in the Mathieson files, including the executory contract with plaintiff. They concluded that the contract with plaintiff was improvident and undesirable for Mathieson in that it deprived Mathieson of the right to use or otherwise dispose of in more profitable ways the anhydrous ammonia production from its Lake Charles plant for a substantial period of eight years. Also, from Mathieson's point of view, they thought it important to prevent plaintiff from dominating the ammonia market in the Gulf States.

Accordingly, in September 1948, Nichols contacted plaintiff's president, Henry Perry (now deceased), and indicated that he desired to negotiate a cancellation of the executory contract before it became operative. For several months, the presidents of the two companies conducted frequent discussions in an effort to arrive at a mutually satisfactory basis for termination of the agreement. In the course of these discussions, both men had made independent estimates of plaintiff's projected earnings under the contract and, at least insofar as Nichols was concerned, he felt the most equitable method of terminating the contract would be for Mathieson to pay plaintiff an amount which, making certain assumptions, would be substantially equivalent to the profits which plaintiff would probably realize if the contract were fully performed. It is unclear whether Perry shared Nichols' method of approach in this regard. One of Perry's principal assistants, who was opposed to any cancellation or modification of the contract, believed that his president was simply uncomfortable in the face of Nichols' determined opposition to the contract and

---

2. In August 1948, the Government, acting through the War Assets Administration, approved the sale of the Lake Charles plant to Mathieson.

that the eventual figure agreed upon between the two presidents was, in Perry's view, merely an acceptable settlement of a difficult situation without specific correlation to plaintiff's anticipated profits.[3]

In any event, on December 30, 1948, the parties entered into an agreement canceling the 1947 contract. Under the terms of the cancellation agreement, Mathieson obligated itself to pay plaintiff $2.6 million in installments over an eight and one-half year period, $500,000 being payable upon execution of the agreement in 1948, $300,000 being payable on July 1 of each of the six succeeding years (1949–1954), and $150,000 being payable on July 1 of each of the final two years (1955–1956). The installment payments agreed upon were paid by Mathieson to plaintiff substantially in accordance with the cancellation agreement.

In its 1948 Federal income tax return, plaintiff included as ordinary income the first payment of $500,000 which it had received from Mathieson on December 30, 1948. In its 1949 return, plaintiff treated the next Mathieson payment of $300,000 in the same way. However, on July 13, 1951, plaintiff filed an amended return for 1948 in which it included the entire amount paid and payable by Mathieson under the cancellation agreement as ordinary income. In a statement attached to the amended return, plaintiff explained that, by reason of a recent decision of the United States Court of Appeals for the Seventh Circuit in Universal Oil Products Co. v. Campbell, 181 F.2d 451 (7th Cir., 1950), cert. denied 340 U.S. 850, 71 S.Ct. 78, 95 L.Ed. 623 (1950), it had concluded that the full amount payable under the cancellation contract should have been accrued for Federal income tax purposes in the year 1948.

The amended return increased plaintiff's tax liability for 1948 by $798,000, which amount was paid with interest. Shortly thereafter, plaintiff filed its claim for refund of 1949 tax on the ground that it had erroneously included in 1949 income the $300,000 payment received from Mathieson on July 1, 1949. That claim for refund of 1949 income tax was allowed and appropriate refund was made. Thereafter, of course, plaintiff did not include in its tax returns for subsequent years any of the Mathieson installment payments.

On June 30, 1954, plaintiff filed a timely claim for refund of an alleged overpayment of 1948 tax on the ground that the $2.6 million received or receivable from Mathieson under the cancellation agreement represented proceeds from the sale of a capital asset and, therefore, should be taxed to it as capital gain. Following an unusually long administrative proceeding before the Internal Revenue Service, the claim for refund was formally rejected on December 18, 1961. Thereafter, on December 13, 1963, plaintiff filed its petition in this case asserted as its sole ground for recovery "that the amount of $2,600,000 receivable from Mathieson Chemical Corporation was not ordinary income but represented the proceeds from the sale of a capital asset."

Meanwhile, following an audit of plaintiff's tax returns for each of the years 1949–1956, the Commissioner of Internal Revenue asserted deficiencies in plaintiff's income taxes for four of those years, such deficiencies being unrelated to the issues here involved. Plaintiff contested those deficiencies in the Tax Court. Following the Tax Court's decision (42 T.C. 455) partially upholding the deficiencies, plaintiff appealed to the Second Circuit Court of Appeals. On May 26, 1965, the appeal was dismissed pursuant to a settlement by the parties. By virtue of the dismissal, no further deficiencies in plaintiff's taxes or the years 1951 and 1954–1956 could be asserted. At the time the settlement was reached, neither plaintiff's representatives, nor the Department of Justice, nor the Internal

3. As stated below, the eventual settlement figure was 2.6 million dollars, whereas Perry's aide had estimated plaintiff's anticipated profits from the contract at nearly 4 million dollars.

Revenue Service, knew that plaintiff would thereafter amend its petition in the instant action.

On September 13, 1965, plaintiff filed an amended petition in the pending action adding second and third causes of action, the effect of which was to challenge the propriety of reporting the entire gain in 1948. Prior to the time that the amended petition was filed, plaintiff's officers, employees, and representatives had made no statements or representations to the Internal Revenue Service indicating that plaintiff intended to, or did in fact, claim a refund of 1948 income tax on the grounds set forth in the second and third causes of action of its amended petition. At the time the amended petition was filed, all the years 1949 through 1956 were closed to further assessment.

### I.

As earlier indicated, plaintiff's amended petition added second and third causes of action to the original petition's sole cause of action which asserted that the proceeds of the cancellation agreement constituted capital gain. The second cause of action asserted that "plaintiff incorrectly reported the entire sum of $2,600,000.00 in its amended Federal income tax return for the calendar year of 1948, instead of the sum of $500,000.00 actually received from Mathieson Chemical Corporation in that year." The third cause of action asserted that "on its amended U.S. corporation income tax return for the year 1948, filed July 13, 1951, taxpayer improperly changed its election to report the income from the installment method [which method was elected on plaintiff's timely original return] to the accrual method." The upshot of both additional causes of action was plaintiff's claim that, because the cancellation agreement proceeds were improperly reported in their entirety in 1948 rather than properly reported as and when received, an overpayment of 1948 taxes resulted entitling plaintiff to a refund thereof.

Plaintiff has admitted that in filing its refund claim and in pursuing it administratively, it did not intend to assert as grounds for recovery the positions set forth in the second and third causes of action of its amended petition. It says, however, that those causes of action are related and germane to, and stem from, the refund claim filed June 30, 1954. Also, the additional causes of action encompass no new or different facts other than those stated therein, and that such facts underlie the causes of action in the original petition and in plaintiff's amended petition.

Defendant does not dispute that the operative facts which underlie plaintiff's claim to capital gain treatment also relate to the questions now sought to be raised regarding the proper year in which the income should have been reported. Defendant further acknowledges that the Internal Revenue Service had knowledge of these facts, and that it considered the accrual question, although not in connection with the refund claim. Defendant insists, however, that there is substantial variance between the refund claim and the amended petition to such extent that the second and third causes of action set forth in the amended petition may not be considered by this court. Defendant also asserts that the operative facts form a proper basis upon which to estop plaintiff from advancing the grounds for recovery contained in the second and third causes of action. We hold that defendant's position with respect to the substantial variance issue is well taken, hence we need not reach the estoppel issue.

Section 3772(a) (1) of the Internal Revenue Code of 1939, the statutory provision which governs the procedural question under review, provides that no refund suit shall be maintained in any court "until a claim for refund or credit has been duly filed with the Commissioner, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof." Treasury Regulations 111 (1939 Code), section 29.322–3 imparts, with re-

spect to the relationship between the requisite elements of a refund claim and a later recovery, that:

> No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed prior to the expiration of such period. *The claim must set forth in detail each ground upon which a refund is claimed,* and facts sufficient to apprise the Commissioner of the exact basis thereof. \* \* \*. [Emphasis added.]

Thus, it is seen that under the applicable regulations a refund claim must, as a matter of functional composition, depict with some particularity those grounds upon which a subsequent recovery might be granted.

In the judicial realm, the so-called variance rule recently was the subject of an extensive and detailed discussion by this court in Union Pacific Railroad Co. v. United States, 389 F.2d 437, 182 Ct.Cl. 103 (1968). In *Union Pacific,* we stated with ample authority:

> It is an undisputed general rule that a ground for refund neither specifically raised by, nor comprised within the general language of, a timely informal or informal application for refund to the Internal Revenue Service cannot be considered by a court in which a suit for refund is subsequently initiated. United States v. Felt & Tarrant Mfg. Co., 283 U.S. 269, 51 S.Ct. 376, 75 L.Ed. 1025 (1931); Real Estate-Land Title & Trust Co. v. United States, 309 U.S. 13, 17–18, 60 S.Ct. 371, 84 L.Ed. 542 (1940); International Curtis Marine Turbine Co. v. United States, 56 F.2d 708, 74 Ct.Cl. 132 (1932); Midvale Co. v. United States, 138 F.Supp. 269, 133 Ct.Cl. 881 (1956); Williamson v. United States, 292 F.2d 524, 155 Ct.Cl. 279 (1961). The rule that a taxpayer cannot present one ground for refund in its claim and a different ground in its petition is designed both to prevent surprise and to give adequate notice to the Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination. United States v. Memphis Cotton Oil Co., 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619 (1933). In addition, the Commissioner is provided with an opportunity to correct any errors, and if disagreement remains, to limit the scope of any ensuing litigation to those issues which have been examined and which he is willing to defend. Carmack v. Scofield, 201 F.2d 360, 362 (5th Cir. 1953); Thompson v. United States, 332 F.2d 657, 660 (5th Cir. 1964); Tucker v. Alexander, 15 F.2d 356 (8th Cir. 1926), reversed on other grounds, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253 (1927). [389 F.2d at 442, 182 Ct.Cl. at 108–109]

It is clear in the instant case that at no time during the entire administrative proceedings did the Internal Revenue Service have cause to believe that plaintiff claimed, or would claim, an additional refund of 1948 income tax based upon the alleged impropriety of taxing the entire gain in 1948. Indeed, it was plaintiff who requested such treatment, to which request the Service acceded. And it was not until the addition of the second and third causes of action in the 1965 amended petition that the Service was first put on notice *by plaintiff* of its claim that, contrary to its earlier requested treatment, the gain was not reportable in its entirety in 1948. What plaintiff purports to do by its amended petition is, we think, clearly without the limits of the variance rule as interpreted by the *Union Pacific* case.

Plaintiff reasons that its position is advanced by the congruence of operative facts underlying the three causes of action; this alone will not suffice. Implicit in plaintiff's argument is the imputing to the Service of constructive notice regarding all potential grounds for recovery issuing from a submitted fact situation, irrespective of the point in time at which a particular ground is ac-

tually advanced. Apparently plaintiff would impose upon the Service the insatiable burden of anticipating all grounds which plaintiff might, in fact, ultimately advance. The imposition of such a burden upon the Service is, in our view, contrary to the rationale underlying the variance rule, and inconsistent with fair administration of revenue collection and disbursement.[4]

The possibility that the Service might, by its own devices, deduce from the submitted facts the ground ultimately advanced by the taxpayer is not enough to remedy the insufficiency in plaintiff's position. Neither is the insufficiency cured by the Service's consideration, as here, of the later-raised accrual question in a context only indirectly related to plaintiff's refund claim. The decisions of this court make clear the untenable nature of plaintiff's position. Particularly pertinent, again, is our recent *Union Pacific* decision in which we said:

> A taxpayer might obtain a recovery in his refund suit on a ground other than that specified in his claim if he can establish adequate notification to the Internal Revenue Service of an intention to claim a refund on that ground. Mere availability of the facts underlying a claim, however, is not enough to find that an intention to claim a refund has been communicated. In American Radiator & Standard Sanitary Corp. v. United States, 318 F. 2d 915, 162 Ct.Cl. 106 (1963), we said:
>
> > It is not enough that the Service have in its possession information from which it might deduce that the taxpayer is entitled to, or might desire, a refund; * * *. [318 F.2d at 920, 162 Ct.Cl. at 114]

The Supreme Court, in Angelus Milling Co. v. Commissioner of Internal Revenue, 325 U.S. 293, 65 S.Ct. 1162,

89 L.Ed. 1619 (1945), discussing a comparable problem, stated:

> It is not enough that in some roundabout way the facts supporting the claim may have reached him. The Commissioner's attention should have been focused on the merits of the particular dispute. The evidence should be clear that the Commissioner understood the specific claim that was made * * *. [at 297–298, 65 S.Ct. at 1165]
>
> * * * [I]t is not enough that somewhere under the Commissioner's roof is the information which might enable him to pass on a claim for refund. [at 299, 65 S.Ct. at 1165]

Neither the Commissioner nor his agents can be expected to ferret out any possible grounds for relief which a taxpayer might assert. Availability of information is not equivalent to notice that a claim is asserted based on that information. That claim must somehow be communicated to the Service. [389 F.2d at 444–445, 182 Ct.Cl. at 113]

In the instant case, there can be little doubt that plaintiff failed in the administrative stage to claim a refund on a ground which raised the accrual issue, and thereby failed to properly put the Service on notice of its intention to advance such ground in a judicial forum. Accordingly, we hold that the grounds set forth in the second and third causes of action of plaintiff's amended petition constitute a substantial variance from its administrative refund claim and, therefore, cannot provide the basis for a recovery here.

## II.

■ Turning now to the ground for recovery advanced by plaintiff administratively and as a first cause of action

---

4. Subject to the same objections is plaintiff's contention that its claim for a refund of $338,000 "or such additional sums as may by law be due" entitles it to belatedly advance the grounds comprising the second and third causes of action.

*See*, National Forge & Ordnance Co. v. United States, 151 F.Supp. 937, 941, 139 Ct.Cl. 204, 222 (1957); Electric Storage Battery Co. v. McCaughn, 54 F.2d 814 (E.D.Pa.1931), affirmed, 63 F.2d 715 (3d Cir. 1933).

in its petition, plaintiff contends that the original contract between Mathieson and plaintiff constituted a capital asset, the surrender of which gave rise to capital gain. Defendant responds that the cancellation of the original contract gave rise to ordinary income, rather than capital gain, because the cancelled contract *did not* constitute a capital asset. Defendant's position is well taken.[5]

The question of whether the consideration received by a taxpayer for agreeing to the cancellation of a contract should be taxed as capital gain or as ordinary income has produced decisional turmoil likened to "some of the more arcane intricacies of medieval theology." Eustice, Sontract Rights, Capital Gain, and Assignment of Income—The Ferrer Case, 20 Tax L.Rev. 1 (1964).[6]

The nature of the problem has been well stated by Judge Friendly in his landmark decision, Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (2d Cir., 1962), as follows:

Section 117(a) of the 1939 Code, now § 1221 of the 1954 Code, 26 U.S. C.A. § 1221, tells us, not very illuminatingly, that " 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include" four (now five) types of property therein defined. However, it has long been settled that a taxpayer does not bring himself within the capital gains provision merely by fulfilling the simple syllogism that a contract normally constitutes "property," that he held a contract, and that his contract does not

fall within a specified exclusion, C. I. R. v. Gillette Motor Transport, Inc., 364 U.S. 130, 134–135, 80 S.Ct. 1497, 4 L. Ed.2d 1617 (1960); Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv.L.Rev. 985, 988 (1956). This is easy enough; what is difficult, perhaps impossible, is to frame a positive definition of universal validity * * *. [304 F.2d at 129]

Judge Friendly then proceeds to a careful analysis of most of the leading cases in this area, and summarizes his conclusions in the following widely quoted statement:

One common characteristic of the group held to come within the capital gain provision is that the taxpayer had either what might be called an "estate" in (Golonsky, McCue, Metropolitan), or an "encumbrance" on (Ray), or an option to acquire an interest in (Dorman) property which, if itself held, would be a capital asset. In all these cases the taxpayer had something more than an opportunity afforded by contract, to obtain periodic receipts of income, by dealing with another (Starr, Leh, General Artists, Pittston), or by rendering services (Holt), or by virtue of ownership of a larger "estate" (Hort, P. G. Lake). We are painfully aware of the deficiencies of any such attempt to define the wavering line even in this limited area, but it is the best we can do * * *. [304 F.2d at 130–131]

The foregoing principles were applied by Judge Friendly to the facts before the

---

5. Defendant explicitly conceded at oral argument that which was implicit in its brief, i. e., the cancellation of the original contract in the instant case constituted a sale or exchange. Accordingly, our denial of capital gain treatment to plaintiff herein rests upon our conclusion that the original contract dird not constitute a capital asset in plaintiff's hands. *Compare*, United States Freight Co. v. United States, 190 Ct.Cl. 725, 422 F.2d 887 (1970), wherein we held that assuming *arguendo* the contract involved constituted a capital asset, there was no sale or exchange, prerequisite to capital treatment.

6. In addition to this excellent article by Professor Eustice, see also the equally sweeping discussions of this problem contained in Dean, Capital Gain and Ordinary Income—Problems in Transmutation, 24 N.Y.U.Inst. on Fed.Tax. 1291 (1966) and Chirelstein, Capital Gain and the Sale of a Business Opportunity: The Income Tax Treatment of Contract Termination Payments, 49 Minn.L.Rev. 1 (1964). The latter article, in particular, is valuable for its exhaustive analysis of all the significant decisions in this difficult area of tax law.

court. He concluded that the taxpayer, actor Jose Ferrer, was entitled to capital gain treatment for payments made to him in consideration of his surrendering a lease which he held to produce the play, *Monsieur Toulouse*, on stage, as well as for payments made to him for releasing his power under a contract with the playwright to prevent the presentation of the play as a motion picture, on radio, or television. However, Mr. Ferrer also received payments for the surrender of his rights to receive a percentage of any proceeds derived from the play's future production as a movie or on radio or television, and the court felt that those payments constituted ordinary income to Mr. Ferrer.

The essential reason for the court's conclusion that the payments made to Ferrer for surrender of his lease were entitled to capital gain treatment was that he had an "equitable interest" in the copyright of the play sufficient to enable him to enjoin the playwright from interfering with his production of the play. The same reasoning applied to the payments made to Ferrer for his release of the power to prevent production of the play as a movie, or on radio, or television. Since, however, he had no proprietary right in the movie, radio, or television rights themselves, the payments made to him for the surrender of a right to a percentage of profits from those sources constituted ordinary income.

Singularly enough, both parties to the present controversy rely on *Ferrer* as support for their respective positions. Pointing to the fact that, in the part of his opinion allowing capital gain treatment, Judge Friendly emphasized the importance of the availability of injunctive relief to the taxpayer, plaintiff asserts that such equitable relief was likewise available to it under the contract in question. The contract was to be interpreted under the laws of the State of New York, and plaintiff finds support for its suggestion of the availability of equitable relief in a decision by the New York Court of Appeals which would appear to

permit the entry of a decree of specific performance for breach of a contract such as the present one where, due to changing future market conditions, it would be impractical to ascertain damages for breach of contract in the normal way. See St. Regis Paper Co. v. Santa Clara Lumber Co., 173 N.Y. 149, 65 N.E. 967 (1903); *cf.*, however, Fox v. Fitzpatrick, 190 N.Y. 259, 82 N.E. 1103 (1907).

The government, on the other hand, argues that the contractual rights which plaintiff acquired in 1947 and which it agreed to cancel in 1948, amounted to nothing more than an opportunity to obtain periodic receipts of income by dealing with another, and that, hence, the other facet of Judge Friendly's opinion in *Ferrer* is the one applicable here. Plaintiff has made a persuasive showing that, in the event of a breach of the contract by Mathieson, plaintiff could have obtained equitable relief in the form of a decree for specific performance. Bearing in mind the emphasis placed by Judge Friendly on the availability of such equitable relief as a major factor pointing to capital gain treatment of the termination proceeds, plaintiff's reliance on *Ferrer* is understandable. This reliance loses much of its persuasiveness, however, when it is recognized that the equitable relief potentially available to plaintiff would likely be based not upon a proprietary or equitable interest in Mathieson's plant or output, but rather upon the difficulty of ascertaining damages. Moreover, the argument advanced by plaintiff fails to take into account a recent decision of this court which, in our judgment, cannot satisfactorily be distinguished from the present case, and which requires a decision in favor of the defendant's contention that the Mathieson cancellation payments constituted ordinary income to plaintiff.

The case referred to is Coleman v. United States, 388 F.2d 337, 181 Ct.Cl. 982 (1967). There, as here, the court was presented the question of whether payments made to a taxpayer in consider-

ation of the cancellation of an existing contract resulted in capital gain or ordinary income. Under the pre-existing agreement which was canceled, the taxpayer's predecessor in interest, Reliance Carbon Company, Inc., had agreed to purchase from The Shamrock Oil and Gas Corporation a stipulated quantity of residue gas (extracted by Shamrock from natural gas) and to construct a plant for utilizing such residue gas in the manufacture of carbon black. In addition, Reliance had the option to resell the residue gas to others rather than itself using it in its carbon black manufacturing process. Under the agreement which terminated the pre-existing contract, Shamrock received the right to sell all of its residue gas to other persons, and agreed to pay Reliance a stipulated amount based on Shamrock's future gas production. In passing on the same contention as that made by plaintiff here, this court said:

> In our case, the contractual rights which the taxpayer disposed of in the transaction of November 19, 1952 were, first, the right to purchase residue gas from Shamrock on a priority basis under the gas sales agreement of October 1, 1935, as amended, and, second, the right to burn the entire quantity of purchased gas in the manufacture of carbon black, or to use a portion of such gas for the manufacture of carbon black and resell another portion to third persons if this seemed advantageous to the taxpayer. In other words, what the taxpayer had was "a naked contract right" to purchase gas and thereafter to process or resell the gas, thereby obtaining periodic receipts of ordinary income. *Cf.* Commissioner of Internal Revenue v. Pittston Company, 252 F.2d 344, 348 (2nd Cir. 1958), cert. den. 357 U.S. 919, 78 S.Ct. 1360, 2 L.Ed.2d 1364 (1958).

Even in the first CBN case [CBN Corp. v. United States, 328 F.2d 316, 164 Ct.Cl. 540], where a majority of the court held that the CBN Corporation had an economic interest in the gas in place under the new agreement of November 19, 1952 between Shamrock and the CBN Corporation, the court said that under the previous gas sales agreement of October 1, 1935, as amended, between those parties, the CBN Corporation "was nothing more than a purchaser with certain priority rights of purchase" (328 F.2d at page 321, 164 Ct.Cl. at page 549). The contractual rights of the present taxpayer under the gas sales agreement of October 1, 1935, as amended, between Shamrock and the taxpayer were exactly the same, in all substantial respects, as the rights of the CBN Corporation under the similar gas sales agreement of October 1, 1935, as amended, to which the CBN Corporation was a party. Therefore, under the pronouncements by the court in both the first *CBN* case and the second *CBN* case, [364 F.2d 393, 176 Ct.Cl. 861], the taxpayer did not have any interest in the gas itself, prior to delivery by Shamrock, under the gas sales agreement of October 1, 1935, as amended.

Accordingly, since the gas sales agreement of October 1, 1935, as amended, between the taxpayer and Shamrock merely conferred on the taxpayer "a naked contract right" to purchase gas and use it or resell it as a means of obtaining periodic receipts of ordinary income, and did not vest in the taxpayer an interest in property, the disposition of such right in the transaction of November 19, 1952 between Shamrock and the taxpayer did not involve the disposition by the taxpayer of a capital asset. [388 F.2d 343, 181 Ct.Cl. 993–994]

Clearly, the present case cannot be distinguished from *Coleman* on the grounds of availability of injunctive or equitable relief in the one and a lack of such relief in the other. Under Texas law the original Reliance-Shamrock contract could have been specifically enforced just as under New York law the contract between plaintiff and Mathieson could have been. See, for example, American Refining Co. v. Tidal Western Oil Corp. (Tex.

Civ.App.), 264 S.W. 335 (1924), writ of error denied, 114 Tex. 583, 278 S.W. 1114 (1926).

Indeed, plaintiff makes no effort to distinguish *Coleman* on any such ground. Instead, plaintiff argues that *Coleman* differs from the present case because of the fact that the consideration payable to Reliance for the surrender of its contractual rights was dependent upon future production of gas by Shamrock, whereas the consideration payable to plaintiff by Mathieson was a fixed sum in no way related to, or dependent upon, Mathieson's future production and sale of ammonia. This is not an acceptable distinction.

Under the *Ferrer* decision itself, a determination of whether contract cancellation payments constitute ordinary income or capital gain cannot be made by looking simply at the method agreed upon by the contracting parties for arriving at the amount of compensation payable for the cancellation agreement. In resemblance to *Coleman*, the payments made to Mr. Ferrer for the release of his contractual rights were based upon (in addition to salary payments) a stipulated percentage of the net profits derived from distribution of the picture. Accordingly, plaintiff's argument in this respect would lead to the conclusion that *all* amounts received by Ferrer were taxable to him as ordinary income. The decision in *Ferrer*, however, is to the contrary, the court holding that part of Ferrer's receipts was capital gain and part was ordinary income. It is apparent, therefore, that the important consideration in this connection is the nature of the contract rights surrendered rather than the method of computing the payments for the cancellation.

Concluding, as we do, that *Coleman* controls the disposition of the capital gain issue, further discussion of the perplexing decisions referred to in *Ferrer* would merely lengthen this opinion to no useful purpose. Therefore, it is held that plaintiff's treatment of the Mathieson payments as ordinary income in both

its original and amended 1948 tax returns was the correct treatment.

In accordance with the above, plaintiff is not entitled to recover in this action, and its petitions are dismissed.