**Richard T. SILBERMAN, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 93–768.

United States Court of Federal Claims.

June 2, 1998.

---

Peter Aylward, with Brent Lawrence, Jamul, CA, for plaintiff.

Robert Stoddart, Washington, DC, with whom were David Gustafson, Assistant Chief, and Mildred L. Seidman, Chief, Court of Federal Claims Section, and Loretta C. Argrett, Assistant Attorney General, Tax Division, U.S. Department of Justice, for defendant.

### OPINION

SMITH, Chief Judge.

## I. INTRODUCTION

This case comes before the court on plaintiff's motion for summary judgment and defendant's cross motion for partial summary judgment. At issue is whether legal expenditures incurred by plaintiff, while defending himself against criminal charges of money laundering and in a parallel civil suit, are properly deductible as I.R.C. 162(a) business expenses on plaintiff's 1988 and 1989 federal income tax returns. Plaintiff claims that his legal fees are properly deductible under 162(a) and requests the court to grant summary judgment on that issue. Defendant's motion for partial summary judgment requests the court to find that plaintiff's expenses are not deductible under § 162(a). Defendant also requests summary judgment on one of several counterclaims alleging that plaintiff owes additional unpaid taxes.

## II. FACTS

Plaintiff, Richard T. Silberman, incurred over $600,000 in legal expenses defending himself in a criminal trial on charges of money laundering and in a parallel civil trial. Silberman was accused of using the stock of Yuba American Gold, Ltd. (YAG), a company for which Silberman served as chief executive officer, to launder drug money. Shareholders of YAG's parent company, Yuba Natural Resources, brought a contemporaneous civil stockholder's derivative suit against Silberman, claiming that Silberman's allegedly criminal conduct had harmed the company.

Plaintiff's legal difficulties arose in this way: Mr. Silberman, from 1983 to 1989, was Chief Executive Officer and Chairman of the Board of Yuba Natural Resources, Inc. (YNR), a subsidiary of International Resources, Inc. One of Mr. Silberman's primary duties as CEO was to raise money for the company's projects. He did this in part through sale of stock in private placements. In the spring of 1987, Silberman and YNR's board of directors incorporated Yuba American Gold, Ltd. (YAG) in Canada to serve as an international subsidiary of YNR for fund raising purposes. Silberman was made Chief Executive Officer and Chairman of the Board of YAG as well. YNR intended YAG stock to be sold to investors outside of the United States, and in 1987 Silberman did in fact sell YAG stock to several foreign investors, some of which were Swiss, in private placements. At the time of the private placements, Silberman intended (and expressed his intent to the investors) to make an initial public offering of YAG stock on the Toronto Stock Exchange in the immediate future. However,

the world-wide market crash in October 1987 made a public offering unworkable at that time. One of the Swiss investors, unhappy that no public market in YAG stock had emerged as promised, began pushing Silberman to find a purchaser for its shares. Silberman turned to two long-time acquaintances, Christopher Petti and Jack Myers, for help.

## A. The Stock Sale

In October of 1988, Silberman told Christopher Petti, a long-standing acquaintance of Silberman's, that he was trying to find a buyer for YAG stock owned by a disgruntled Swiss investor. Unbeknownst to Silberman, or to Petti himself, Petti had been under investigation by the FBI since April of 1988 concerning the financing of an unrelated proposed business deal. Two of the individuals involved in the Petti investigation were Richard Benjamin, a cooperating witness for the FBI; and Special Agent Peter Ahearn, an FBI agent posing as "Pete Carmassi," a Mexican businessman working for Columbian drug traffickers. Petti introduced Benjamin to Silberman as someone who might be able to help him find investors. Benjamin then introduced plaintiff to Agent Ahearn (in his role as Carmassi), suggesting that Ahearn might be interested in investing in YAG.

At a November 9, 1988 meeting, Ahearn agreed to invest $100,000 in YAG stock. It apparently was explained to Silberman at this time that the money to be used for the purchase did not come from legitimate sources and that it was important that the transaction not be documented in Currency Transaction Reports.[1]

On November 10, Silberman contacted Jack Myers, a financial advisor who had worked on political matters with Silberman in the past, to help him find a way to move the Ahearn cash without records. Myers procured the aid of investment banker Terry Ziegler, who worked for the brokerage firm Hamilton Williams. According to defendant and evidence presented at Silberman's criminal trial,[2] it was agreed that Ziegler would get six percent of the $100,000 in exchange for moving the money and Myers and Silberman would each get two percent.

On November 30, Myers and one of Ziegler's employees, Darryl Naka, met Ahearn at a hotel to pick up the money. According to defendant and criminal trial evidence, Silberman told Ahearn by telephone that he had used the same pick up system before and it worked well.

Silberman allowed Myers to keep the two percent ($2000) share of the money allegedly allotted to Silberman, so that Myers' take on the deal was $4000. The IRS argues that Silberman should have reported the $2000 originally allotted to him for arranging the stock transaction on his 1988 tax return. Silberman asserts that he received no money from this transaction and therefore owes no additional tax. The IRS also claims that Silberman should have filed an informational return and paid a wage tax on behalf of any persons who were paid for helping him with the transaction. Silberman denies that the others involved were acting as his employees.

Ziegler then moved the money from the United States through Hong Kong to Switzerland, where it was used to purchase some of the YAG stock held by the discontented Swiss investor. On December 7, 1988, Myers delivered YAG stock certificates to Ahearn, and the first transaction at issue was completed.

## B. The Bond Sale

After a series of meetings and conversations between Silberman and Ahearn, a

---

1. Financial institutions are required by federal law (31 U.S.C. § 5313(a)) and Treasury Department regulations (31 C.F.R. § 103.22(a)(1)) to file Currency Transaction Reports on all cash transactions of over $10,000. Under the Money Laundering Control Act of 1986 (18 U.S.C. § 1956(a)(2)(b)) it is a federal crime for an individual or entity to structure or assist in structuring a transaction for the purpose of evading § 5313(a) reporting requirements.

2. See Appendix C, Motion for Summary Judgment on defendant's Counterclaims. *United States of America v. Richard T. Silberman, et al.,* Criminal Case No. 89–0417–JLI, U.S. District Court, Southern District of California, Volume XVII, Transcript of Trial, p. 1127.

second transaction was agreed to in early February, 1989. Ahearn had expressed an interest in getting something other than stock for his money, and Silberman, though preferring to deal in YAG stock, finally agreed to procure U.S. bearer bonds for Ahearn in exchange for $200,000 cash.

On February 22, Myers and Naka again met Ahearn at a hotel to pick up the $200,-000. The commissions agreed upon in this deal were to be $8000 for Myers, $8000 for Silberman, $4000 for Ziegler and $4000 for Ahearn. Silberman denies receiving a commission on this transaction, but defendant alleges that Silberman kept his allotted commission on this transaction and did not report the money received on his 1989 tax return. Nor did Silberman file informational returns or pay wage taxes on money earned by the people who helped him with the transaction.

The $200,000 was delivered to Ziegler at the Hamilton Williams brokerage firm, and Ziegler provided Myers with bearer bonds. On March 2, 1989 Myers delivered the bonds to Ahearn, which completed the second transaction. On April 7, 1989, Silberman was arrested after a meeting with Ahearn discussing a third transaction. Plaintiff was subsequently indicted on charges arising from the first two transactions, the stock sale and the bond sale.

While the criminal charges were pending against Silberman, YNR shareholders filed a derivative suit against him, on May 3, 1989, charging that Silberman's allegedly criminal conduct had a detrimental effect on the company. Silberman was ultimately convicted on one of the seven criminal counts on which he was indicted and pled guilty to a second in exchange for having the remaining counts dismissed. The shareholders' derivative suit was settled. According to the terms of the settlement agreement, Silberman, in exchange for 160,000 shares of stock in YNR, renounced all claims he had against YNR, including "any and all liabilities, claims, causes of action, costs (including costs of suit and attorney's fees and expenses) ..."[3]

Silberman deducted the legal fees incurred in these two lawsuits as § 162(a) business expenses on his 1989 and 1990 tax returns. After audit, the IRS disallowed his deductions, and Silberman filed suit in this court.

## III. DISCUSSION

### A. Plaintiff's Motion for Summary Judgment

At the time of the transactions described above, plaintiff was providing executive management and financial services to YNR and YAG under a five-year employment contract entered into between plaintiff and YNR on April 1, 1987. The agreement was terminated three years early, on April 11, 1989, due to the criminal allegations pending against Mr. Silberman. During the period that Silberman worked for YNR (1983–1989), plaintiff also provided financial advisory services to third parties as an independent contractor.

Section 162(a) of the Internal Revenue Code allows for the deduction of "ordinary and necessary" expenses paid or incurred in the carrying on one's trade or business. Plaintiff asserts that both his criminal and civil legal defense expenses were ordinary and necessary expenses incurred as a result of acts performed in the course of his duties as an officer and employee of YAG and YNR and that they are therefore properly deductible under § 162(a).

To determine whether legal expenditures incurred are business or personal expenditures, one looks to the "origin and nature of the claim with respect to which an expense was incurred." *United States v. Gilmore*, 372 U.S. 39, 49, 83 S.Ct. 623, 629, 9 L.Ed.2d 570 (1963). "Litigation expenses are deductible if the suit against the taxpayer 'arises in connection with' or 'proximately results from' the taxpayer's business or profit-seeking activity." *O'Malley v. Commissioner of Internal Revenue*, 91 T.C. 352, 362, 1988 WL 87084 (1988) (quoting *Gilmore*, 372 U.S. at 48, 83 S.Ct. at 629). Plaintiff believes that the origin and nature of the claims

---

**3.** "Defendant's Motion to Strike the Declarations of Edmond M. Connor and Marshall G. Mintz ...", Appendix II, Exhibit 2, ¶ 2, at 34. From

"Mutual Release Agreement" signed by Silberman in settlement of the civil suit on July 27, 1990.

against him was his performance of one of his job duties—raising funds for his employer—and that the lawsuits clearly arose in connection with this business activity.

██ The fact that the conduct of which Silberman was accused and convicted was against the law does not prevent him from deducting his legal defense expenses on his tax return. When an employee engages in illegal conduct in the course of job performance, legal expenses incurred defending himself against criminal prosecution for that conduct are deductible under § 162(a), as long as the conduct was in furtherance of the employee's job performance. For instance, in *Commissioner v. Tellier*, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966), plaintiff Tellier had incurred legal expenses in an unsuccessful defense against criminal charges of securities fraud. The IRS argued that it was against public policy to allow Tellier to exclude from his reported income legal expenses incurred due to his criminal actions. The Supreme Court disagreed with the IRS, holding that "no public policy is offended when a man faced with serious criminal charges employs a lawyer to help in his defense." *Id.* at 694, 86 S.Ct. at 1122.

More recently, in *O'Malley*, the taxpayer was an unpaid trustee of the Teamster's Pension Fund and also Director of Labor Relations for a trucking company. O'Malley was convicted of conspiracy to bribe a U.S. Senator by using Pension Fund property to influence the Senator's vote on a bill that would deregulate the trucking industry. The *O'Malley* court found that plaintiff could properly deduct the money spent on his defense as a business expense because the charges arose from acts conducted in his business capacity on behalf of the trucking company. *Id.* at 363. Despite the fact that the property used in the bribery scheme was owned by the pension fund the court found, "a significant connection between the activities for which Mr. O'Malley was indicted and his employment in the trucking industry." *Id.* at 361. This was enough to satisfy the *Gilmore* test. The fact that O'Malley's supervision of the pension fund did not constitute a trade or business because his trusteeship was uncompensated was irrelevant.

The pension fund property was used *not* to benefit the pension fund, but to further the interests of O'Malley's trucking company employer, so the deduction was allowed.

██ Likewise, Silberman argues that one of his chief duties as CEO of YAG was to raise money for YAG, which naturally included promoting the sale of YAG stock. Arranging a YAG stock sale, even a sale structured in an illegal fashion, clearly falls within this job description. Even the arrangement of the bond sale, although not benefitting YAG directly, was indirectly in his line of duty as YAG executive, asserts Silberman, because Silberman only arranged the bond sale to placate Ahearn and induce him to buy more YAG stock. Silberman draws an analogy between his conduct (in re the bond sale in particular) and O'Malley's use of pension fund property to aid his trucking company employer. Plaintiff argues that he, like O'Malley, would not have engaged in criminal activity but for the desire to benefit his employer. Thus the suits against him "proximately result[ed] from" his job performance and are therefore deductible. *See O'Malley v. Commissioner of Internal Revenue*, 91 T.C. 352, 362, 1988 WL 87084 (1988) (quoting *Gilmore*, 372 U.S. at 48, 83 S.Ct. at 628–29).

Some facts not disputed by either party work to undermine plaintiff's claim that he engaged in the stock and bond sales in the role of YAG employee. For instance, some of the money spent on Silberman's legal defense went toward defending him against the charge of laundering money through the sale of U.S. bonds. Selling U.S. bonds would not intuitively seem to be part of Silberman's role as CEO of YAG. Silberman claims that arranging the bond sale was necessary in order to induce Ahearn to buy more YAG stock. While this may be true, the truth of this assertion is clearly a question of fact and is best determined at trial.

Further, YAG did not directly benefit from the 1988 stock sale. The YAG stock sold in this transaction was not inventory stock owned by YAG. It was stock which had already been purchased by outside (Swiss) investors. The third party investors, not YAG, were the recipients of sale proceeds. It is true that part of plaintiff's job was to

raise money for YAG, but it is not clear that YAG was helped by this transaction. The plaintiff argues that, by finding a purchaser for the Swiss investors' stock, he was making a market in YAG stock, and thereby helping the company indirectly. The court requires fact testimony to determine whether there is a factual basis for this claim.

Because there are significant fact issues in dispute regarding the role in which plaintiff conducted his transactions with Agent Ahearn, the court must deny plaintiff's motion for summary judgment.

## B. Defendant's Cross Motion for Summary Judgment:

Defendant has moved for summary judgment on several grounds:

■ 1) *YAG Stock Was Inventory in Ongoing Money Laundering Operation:* Defendant first asserts that Silberman's motion for summary judgment should be denied because his legal expenses did not arise from his employment with YNR and, therefore, were not "necessary" to YNR's business. Defendant claims that there is substantial evidence that Silberman had been in the business of money laundering long before accepting employment with YNR, and merely used the YAG stock as inventory in this ongoing operation. Thus, his legal expenses in reality arose in connection with the separate, preexisting money laundering operation and cannot be deducted as YAG related business expenses.

Plaintiff denies any previous involvement in money laundering operations and denies that the YAG stock was merely inventory in a money laundering business. Plaintiff points out that he has never been charged with, much less convicted of, any earlier crimes involving money laundering.

It cannot be determined on the basis of material presented to the court thus far whether Silberman's misconduct occurred in the context of his role as YAG employee or if his employment with YAG and use of YAG stock were merely conveniences facilitating

his own ongoing money laundering operation. Accordingly, defendant's cross motion for summary judgment on this issue must be denied.

■ 2) *Plaintiff Should Have Asked YNR for Reimbursement:* Defendant argues that, even if plaintiff's expenses arose from his employment with YNR. plaintiff is not entitled to the deduction for his legal expenses because he could have requested that those expenses be reimbursed by YNR, but failed to do so. Under § 162(a), a taxpayer is allowed to deduct only "ordinary and necessary" business expenses. Abundant case law holds that an employee's expense is not "necessary" if he could have received reimbursement for the expense from his employer, but did not request it. *See, e.g., Orvis v. Commissioner of Internal Revenue,* 788, F.2d 1406, 1408 (9th Cir.1986). "Numerous courts have held that an expense is not 'necessary' under § 162(a) when an employee fails to claim reimbursement for the expenses, incurred in the course of his employment, when entitled to do so." *Id.* at 1408. *See also, Coplon v. Commissioner,* 277 F.2d 534, 535 (6th Cir.1960); *Heidt v. Commissioner,* 274 F.2d 25, 28 (7th Cir.1959).

■ Under YNR's bylaws, YNR *must* reimburse an employee for employment-related legal expenses if the employee's defense is successful on the merits. YNR *may* reimburse an employee whose defense is unsuccessful on the merits if the company believes that the employee a) acted in good faith, b) acted in the best interests of the corporation, and c) had no reasonable cause to believe his conduct was unlawful.[4] Such discretionary reimbursement requires the approval of the shareholders, the board of directors or, in limited circumstances, independent legal counsel in a written opinion.[5] Defendant asserts that plaintiff Silberman failed to seek either mandatory or discretionary reimbursement from YNR, and that he is therefore not permitted to take a § 162(a) deduction.

Silberman claims that he did request reimbursement from YNR and that the settlement agreement which ended the sharehold-

---

**4.** Bylaws of Yuba Natural Resources, Inc., Article XII(a).

**5.** *Id.* at Article XII(d).

er derivative suit also served as settlement of his reimbursement claim.

At the time that the settlement agreement was concluded in July of 1990, plaintiff had been convicted on one of seven counts, and a mistrial had been declared on the other six, which had to be retried.[6] So as of the settlement date, plaintiff was definitely not entitled to mandatory reimbursement under YNR bylaws on the count for which he was convicted because his defense on that count had been unsuccessful. He was potentially eligible for discretionary reimbursement on that count, but he claims that the shareholders in the suit (and, impliedly, the directors of the company as well) felt that he had violated conditions a) through c) outlined above. Given the circumstances—i.e., that plaintiff had been sued by YNR shareholders for engaging in the same conduct that resulted in a criminal conviction—it seems clear that plaintiff did not meet the bylaws' requirements for discretionary reimbursement.

As regards the counts which ended in a mistrial, at the time of the settlement there was a possibility that plaintiff would successfully defeat those counts and thus be entitled to mandatory reimbursement for expenses incurred defending against those counts. Plaintiff asserts that he settled this contingent claim for reimbursement as part of the blanket settlement agreement.

The entire settlement award was included as income on Silberman's 1990 tax return, including any portion of the settlement award which may have been intended as reimbursement for legal expenses. Thus, plaintiff says, it was appropriate to include as § 162(a) deductions 100% of the legal expenses incurred that year as well.

The defendant argues that at no time, including during negotiation of the settlement agreement, did plaintiff explicitly ask for reimbursement of his legal expenses, and that § 162(a) requires that reimbursement be explicitly requested and denied before a § 162(a) deduction is permissible. Defen-

dant quotes abundant case law to the effect that the "burden of establishing that the expense was not reimbursable by the employer rests with [the taxpayer]." *Schaeffer v. Commissioner,* 67 T.C.M. (CCH) 2989, 2990, 1994 WL 199226 (1994) (citing *Podems v. Commissioner,* 24 T.C. 21, 23, 1955 WL 539 (1955)).

While there is no case law directly on point regarding reimbursement requests in circumstances analogous to the plaintiff's, it appears to the court that defendant, in asserting that the taxpayer must, in all cases, explicitly request reimbursement, is trying to circumvent the purpose of the "ordinary and necessary" clause. The purpose of the clause in this context is to assure that a taxpayer who is eligible to have expenses reimbursed by his employers does not forgo reimbursement in favor of taking a personal tax deduction, thereby "converting a business expense of his company into one of his own." *Orvis v. Commissioner,* 788, F.2d at 1408. In this case it is absurd to think that the plaintiff would have been granted discretionary reimbursement by his employer. Silberman had been sued by his employer's shareholders and clearly had an adversarial relationship with his employer. He had engaged in acts egregious enough to spawn a suit on the grounds that his actions had hurt the company. It can be inferred that the company did not believe plaintiff acted in good faith and would not have granted plaintiff discretionary reimbursement for legal expenses incurred defending against the charge of which he had been convicted. Requiring plaintiff to perform a useless act would go against longstanding legal norms. It would also exalt form over substance.

Regarding the six counts still pending at the time of settlement, there is enough evidence that Silberman's attorneys requested compensation, and that YNR's payment to Silberman in the settlement agreement was intended as compensation for a portion of Silberman's legal expenses,[7] to make whether

---

6. Plaintiff ultimately entered into a plea bargain agreement regarding the six counts pending, in which he pled guilty to one of the counts and the remaining five were dropped.

7. I.e., the portion of the legal expenses incurred defending against the still pending counts, the defense of which might have been successful and thus entitled Silberman to mandatory reimbursement under YNR's bylaws.

reimbursement was sought for the cost of defending against those counts a question of fact. Therefore the court must deny the government's motion for summary judgment on this issue.

3) *Plaintiff's Refund Claim is Untimely:* Defendant also asserts on a motion for summary judgment that plaintiff may not be awarded a refund of any sums paid to the U.S. Treasury before March 7, 1993, because plaintiff's refund claim was filed too late for plaintiff to receive a refund of any earlier payments. If a refund claim is not filed within three years of the date on which the tax return for the year in question is filed, the taxpayer's refund is limited to no more than the portion of the tax paid in the two years immediately preceding the filing of the refund claim. 26 U.S.C. § 6511(b)(2)(B).

Before a taxpayer can file suit in court for a tax refund he must first file a claim for a refund or credit with the IRS. This IRS claim "must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." 26 C.F.R. § 301.6402–2(b)(1) (1997). According to defendant, plaintiff's first refund claim submitted to the IRS, dated February 14, 1992, was not sufficiently detailed to meet this standard. Defendant maintains that plaintiff did not file an adequate refund claim until March 7, 1995, more than three years after the last return in question (plaintiff's 1990 return) was filed. Thus, defendant asserts, plaintiff could only receive a refund of monies paid after March 7, 1993.

Plaintiff asserts that his claim for refund filed with the IRS on February 14, 1992, was very close to his original complaint in this suit in both content and meaning, and that in any case, the 1992 tax refund claim contained as much detail as the Code requires. Moreover, defendant was already aware of the facts and circumstances surrounding plaintiff's highly publicized money laundering case. Therefore, says plaintiff, there is no factual basis for defendant's assertion of this

defense, and plaintiff is entitled to judgment as a matter of law.

The Internal Revenue Code and enforcing regulations, "unequivocally require that a claim specify in detail both a factual and legal basis sufficient to apprize the IRS Commissioner of the exact nature of the request." *Boddie–Noell Enterprises, Inc. v. United States,* 36 Fed.Cl. 722, 729 (1996). The claim must, at minimum, "set forth facts sufficient to enable the Commissioner of the Internal Revenue to make an intelligent administrative review of the claim." *Scovill Manufacturing Company v. Fitzpatrick,* 215 F.2d 567, 569 (2d Cir.1954). Plaintiff's 1992 refund claim does not meet this minimum standard.

Plaintiff's original Complaint (filed December 16, 1993) and original (February 1992) claim for refund involved only his 1989 tax return. On plaintiff's amended 1989 return, submitted with his refund claim, plaintiff reported business income from two sources: a salary paid by YNR, reported as "wages" on the first page of plaintiff's tax return, and income from a sole proprietorship investment consulting business reported on Schedule C. However, plaintiff did not report his legal expenses as unreimbursed employee expenses on Schedule A of his 1989 return, as one might expect given plaintiff's characterization of the nature of those expenses in this lawsuit. Rather, plaintiff reported his legal expenses as a business expense on Schedule C, along with his investment consulting income. Barring additional information, it would appear from the face of the return that the legal costs were being claimed as expenses of the investment consulting business. And Silberman included nothing with the 1992 refund claim which would give IRS evaluators reason to suspect that Silberman believed his legal expenses were linked to his YNR employment rather than his independent consulting business.[8] It is true, as plaintiff asserts that his 1992 claim for refund was "very close to his original complaint

---

8. Nothing in § 162(a) prohibits a taxpayer from deducting legal expenses which arise out of an independent consulting business. However, in its analysis of plaintiff's refund claim, the IRS determined as a factual matter that Silberman's

money laundering activities were not connected to his consulting business. Thus his legal fees could not be characterized as an expense of that business. The plaintiff does not challenge this conclusion.

in this suit in both content and meaning." However, there is also nothing in plaintiff's original complaint that would make the reader aware that the legal expenses resulted from his employment with YNR rather than from his independent consulting business. On March 7, 1995, plaintiff did finally file a refund claim with the IRS which stated that the legal expenses were incurred as a YNR employee.[9] But before this date the IRS cannot be said to have been properly put on notice as to the nature of plaintiff's claim.

■ Plaintiff's argument that defendant was aware of the circumstances of his criminal trial and therefore had actual knowledge of the origin of his legal expenses within the statute of limitations period fails to save plaintiff's claim. Caselaw does provide that, if the IRS is actually but "informally" on notice of pertinent details of a taxpayers claim, the statute of limitations will be tolled, even if the official claim filed by the taxpayer was inadequate. *See, e.g., Crocker v. United States*, 563 F.Supp. 496 (S.D.N.Y.1983) (court held that plaintiff's actual refund claim was inadequate, but letters written to the I.R.S. concerning the claim put the IRS on notice as to the factual and legal grounds of plaintiff's claim and tolled the statute of limitations); *see also, United States v. Kales*, 314 U.S. 186, 62 S.Ct. 214, 86 L.Ed. 132 (1941); *United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 53 S.Ct. 278, 77 L.Ed. 619 (1933). However, the informal claim exception does not apply here. In order to demonstrate the existence of an informal claim, a plaintiff must show "that the IRS knew of the facts underlying the claim and understood that a claim was being based on them." *Levitsky v. United States*, 27 Fed.Cl. 235, 241 (1992). Plaintiff has not done this.

■ Unlike the *Crocker* plaintiff, Silberman did not provide the IRS with additional information as to the grounds of his claim. And general knowledge of plaintiff's trial would not put a reasonable person on notice of the nature of his claim. Even if the IRS was aware of some of the circumstances surrounding plaintiff's criminal trial for money laundering, it is not apparent from the bare facts of the trial that plaintiff believed he was acting in the interests of his employer YNR when he arranged the sale.

■ The IRS is not required to "anticipate or deduce the taxpayer's arguments...." Rather, "The plaintiff bears the burden of notifying the IRS of its intentions with respect to" the facts that form the basis of his claim. *Boddie–Noell Enterprises*, 36 Fed.Cl. at 730 (citing *Commercial Solvents Corp. v. United States*, 192 Ct.Cl. 339, 349–50, 427 F.2d 749, 755 (1970)). Plaintiff Silberman did not meet this obligation prior to March 7, 1993.

Therefore the court grants defendant's motion for summary judgment regarding plaintiff's eligibility for refund of payments made before March 7, 1993. Plaintiff did not file a claim for refund adequate to put the IRS on notice as to the nature of his claims until March 7, 1995, and thus cannot receive a refund of payments made more than two years before that date. This court lacks jurisdiction to hear a claim for the earlier payments.

However, a finding for defendant on this point does not result in the dismissal of the case. A substantial proportion of the monies that plaintiff claims are due to be refunded to him were paid on August 12, 1993 or later (some $11,029 plus interest and penalties for the 1989 tax year and around $200,000 for the 1990 tax year). Thus, there is jurisdiction over plaintiff's claims for refund of those payments made after March 7, 1993.

## C. Defendant's Counterclaims

1) Defendant claims that plaintiff owes roughly $3754.99 of accrued, unpaid interest on taxes due in his 1990 taxable year. Plaintiff does not contest this counterclaim.[10] Ac-

---

9. Plaintiff's Second Amended Complaint, filed with this court on October 26, 1995 (with the consent of the defendant) also includes attachments which explain that plaintiff's legal expenses were related to his employment with YNR.

10. *See* plaintiff's "Memorandum of Points and Authorities in Support of Motion for Summary Judgment on defendant's Counterclaims" at 3.

cordingly, as to this first counterclaim, the court finds for defendant.

2) Defendant claims that plaintiff also owes taxes, penalties and interest on the commissions he earned laundering money in 1988 and 1989. Defendant also claims that plaintiff owes taxes, penalties, and interest for failing to withhold taxes and file informational statements for the persons who assisted him in his money-laundering enterprise in 1988 and 1989. However, to avoid the expense of a trial, defendant offered to withdraw these last two claims if the court dismisses Plaintiff's complaint and enters judgment in favor of defendant on the first counterclaim.

Plaintiff moves for summary judgment on this second set of counterclaims on the grounds that his plea bargain agreement from the criminal trial prevents the government from charging him with "any allegations arising from his financial dealings with Special Agent Ahearn."[11] Plaintiff contends that "any" in this clause encompasses civil as well as criminal charges, including civil claims for tax underpayment. Plaintiff also denies receiving a commission on either of the money laundering transactions, and denies that any other participants in the scheme were in an employer/employee relationship with him.

Defendant opposes plaintiff's motion for summary judgment on these counterclaims on two grounds. First, defendant asserts that the plain language of the plea bargain agreement does not support plaintiff's assertion that he is protected from civil tax claims. Rather, the plea bargain agreement is limited to federal *criminal* charges. Secondly defendant asserts that, even if plaintiff's construction of the plea bargain agreement is correct, a United States attorney acting in a proceeding which does not arise under the

internal revenue laws lacks the authority to settle civil tax claims.[12] The government is bound to a contract only if the party entering into the contract on its behalf has *actual* authority to make the contract. *See, e.g., City of El Centro v. United States,* 922 F.2d 816, 820 (Fed.Cir.1990), *cert. denied,* 501 U.S. 1230, 111 S.Ct. 2851, 115 L.Ed.2d 1019 (1991). To the extent, if any, that the attorney who negotiated the plea bargain agreement acted beyond the scope of his authority, the federal government would not be bound by the agreement.

"Although plea bargaining is a matter of criminal jurisprudence, a plea bargain itself is contractual in nature and 'subject to contract law standards'...." *United States v. Krasn,* 614 F.2d 1229, 1233 (9th Cir.1980) (quoting *United States v. Arnett,* 628 F.2d 1162, 1164 (9th Cir., Nov. 26, 1979)). Accordingly, in interpreting a plea bargain agreement the court must follow ordinary rules of contract interpretation. The court will interpret the contract on its face, according to the objective meaning of its language.

Paragraph 3 of the Plea Agreement discusses the scope of the agreement and is the only portion of the Agreement relevant to this case. The paragraph begins with a sweeping statement of its scope, and then goes on to enumerate the categories of allegations which fall within that scope.

> The government agrees that this plea agreement resolves all pending federal criminal charges and investigations against the defendant in this district which are presently known to the attorneys for the Government. This resolution includes any allegations arising from the defendant's financial dealings with FBI Special Agent Ahearn; ...

Plea Agreement, at Paragraph 3.

Read in context, it can be seen that the portion of the agreement which plaintiff cites

---

11. Plea Agreement filed on August 24, 1990 in *United States of America v. Richard T. Silberman,* Criminal Case No. 89–0417–JLI, U.S. District Court, Southern District of California.

12. Defendant cites as support 26 U.S.C. § 7122(a), which provides, in essence, that a Justice Department attorney may settle tax claims only in cases arising under the internal revenue laws, and only after the Secretary of the

Treasury has referred those claims to the Justice Department for prosecution. Defendant points out that Silberman's criminal indictments arose out of U.S.C. Title 18 (Crimes and Criminal Procedure) and Title 31 (Money and Finance), rather than Title 26 (Internal Revenue Code). Thus, defendant asserts, the U.S. attorney prosecuting Silberman could not possibly have been granted the authority to settle tax claims.

906

as supporting his argument that he is protected from civil tax claims is actually already limited by the sentence which precedes it, which restricts the scope of the Plea Agreement to *criminal* charges. This interpretation is reinforced by the last sentence of Paragraph 3, which states that "[t]he attorneys for the Government are aware of no pending federal *criminal* investigations of the defendant aside from those listed above." *Id.* at ¶ 3 (emphasis added).

Thus the Plea Agreement itself is narrowly drafted to protect the plaintiff from prosecution only from federal criminal charges arising out of the Ahearn transactions. Absent any persuasive external evidence that the parties attached a different meaning to Paragraph 3 than the meaning evidenced by the words of the paragraph themselves, the court has no alternative but to deny plaintiff's motion for summary judgment on defendant's second set of counterclaims. The court will not address defendant's argument concerning the actual authority of U.S. attorneys to settle tax cases, as the issue has been resolved in defendant's favor on other grounds.

Whether or not Silberman did in fact receive a commission on the stock and bond sales and whether or not the other individuals involved in the transactions were acting as employees of Silberman are questions of fact and cannot be decided on a motion for summary judgment.

## IV. CONCLUSION

Plaintiff's motion for summary judgment in this case is denied. The court cannot determine without factual testimony whether plaintiff's legal expenditures arose in the course of his employment and are therefore deductible under I.R.C. § 162(a). Also there is a question of fact as to whether the Settlement Agreement in the civil case included compensation for any right to mandatory reimbursement plaintiff might have had under YNR's bylaws, assuming that he successfully defended himself against the criminal charges still pending against him.

Defendant's motion for summary judgment on the plaintiff's claim is granted to the extent that plaintiff seeks recovery of sums paid before March 7, 1993. Claims for sums paid before that date are barred by the statute of limitations.

As plaintiff has presented no opposition, the court finds for the defendant on its first counterclaim involving unpaid interest due for the 1990 tax year.

The court denies plaintiff's motion for summary judgment on defendants second set of counterclaims. Plaintiff's plea bargain agreement does not bar the government from bringing civil tax claims against the plaintiff. The court requires factual testimony to decide defendant's additional counterclaims.

IT IS SO ORDERED.